UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DENISE WRAY,

               Plaintiff,

-against-

WESTCHESTER MEDICAL CENTER
ADVANCED PHYSICIAN SERVICES, P.C., et
al.,

               Defendants.

**MEMORANDUM OPINION
AND ORDER**

21-CV-00394 (PMH)

PHILIP M. HALPERN, United States District Judge:

Denise Wray ("Plaintiff") brings this action against Westchester Medical Center Advanced Physician Services, P.C. ("WMCAPS") and Crystal Amendola ("Amendola," and collectively, "Defendants"). (Doc. 18, "Am. Compl."). The Amended Complaint, the operative pleading, presses eight claims for relief against one or more Defendants: (1) discrimination under both Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*; (2) Title VII and NYSHRL retaliation; (3) Title VII and NYSHRL hostile work environment; (4) discrimination under 42 U.S.C. § 1981; and (5) NYSHRL aiding and abetting. (Am. Compl. ¶¶ 217-33, 240-55).[1]

Pending presently before the Court is Defendants' motion to dismiss the Amended Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). (*See* Doc. 37; Doc. 38, "Def. Br."; Doc. 39, "Opp. Br."; Doc. 40, "Reply Br.").

For the reasons set forth below, Defendants' motion is DENIED.

---

[1] The Amended Complaint also presents an interference claim under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.* (Am. Compl. ¶¶ 234-39). That claim for relief was dismissed with prejudice by stipulation. (Doc. 24).

## BACKGROUND

I.  Plaintiff's Employment with WMCAPS' Predecessor

Plaintiff, a black female, was hired by Medical Research Associates, P.C. ("MRA") as an Administrative Assistant in April 2006. (Am. Compl. ¶¶ 1, 16). Amendola was, at the time Plaintiff was hired, Practice Supervisor and Plaintiff's direct supervisor. (*Id*. ¶ 19). Almost three years after being hired, in December 2008, Plaintiff was not invited to MRA's holiday lunch. (*Id*. ¶¶ 23-24). Amendola planned the lunch and sent the invitations. (*Id*. ¶¶ 28-29). When Plaintiff asked two other employees—identified only as Alexis and Cesar—why she was not invited, both said, "[I]t's because you are [b]lack." (*Id*. ¶¶ 25-26). Some months later, "in the Summer of 2009," another staff member—Jenny—was denied a promotion. (*Id*. ¶ 31). Amendola told Jenny that "as long as [she was] friends with [Plaintiff] she would not get anywhere within the group." (*Id*. (alterations in original)).[2]

II.  Plaintiff's Employment with WMCAPS

A.  Specific Events Before January 2017[3]

WMCAPS acquired MRA sometime in 2013. (*Id*. ¶ 33). Plaintiff maintained her position as an Administrative Assistant and Amendola's title—although still Plaintiff's direct supervisor—was changed from Practice Supervisor to Practice Manager. (*Id*. ¶¶ 33-34).

Sometime "in the Spring of 2014," WMCAPS' Department of Labor Relations ("DLR") conducted an investigation concerning unspecified discrimination Amendola committed against Plaintiff and others. (*Id*. ¶ 38). Plaintiff met with DLR representatives as part of that process and

---

[2] Plaintiff does not identify Amendola, Alexis, Cesar, or Jenny's race. (*See generally* Am. Compl.). Defendants did not raise this issue.

[3] As discussed *infra*, the parties argue over whether—and to what extent—the Court may consider allegations predating January 2017.

reported to them that she felt threatened, was "working in a hostile work environment," and endured "yelling, cursing, intimidating, bullying, and threats" of termination. (*Id*. ¶¶ 40-42). Plaintiff also complained to these representatives that Amendola applied "double standards" and "treat[ed] [w]hite employee[s] better than [b]lack employees . . . ." (*Id*. ¶ 43). Plaintiff avers that Amendola was "required to attend anger management courses," but that she "joked to Plaintiff and other coworkers" about being forced to do so. (*Id*. ¶¶ 44-45).

Sometime in September 2014, Amendola directed Plaintiff and another black employee, Sharon, into Amendola's office. (*Id*. ¶ 48). Once inside, Amendola told Plaintiff and Sharon that "no one wanted to work with them," and told Plaintiff specifically that her assignment was changing so that Amendola "could watch [her] ass." (*Id*. ¶¶ 48-49 (alteration in original)). Plaintiff says that Amendola, while banging her desk, "threatened both employees with termination if they shared the mistreatment they faced with anyone" at WMCAPS. (*Id*. ¶¶ 50-51).

Plaintiff and Sharon, at some point thereafter, complained to a WMCAPS doctor about their interaction with Amendola. (*Id*. ¶ 52). The unidentified doctor insisted that he "never said" he did not want to work with Plaintiff and Sharon and offered to intervene in the matter. (*Id*. ¶¶ 52-54). Plaintiff and Sharon, however, "afraid of retaliation, asked him not to do so." (*Id*. ¶ 54).

Plaintiff's child, sometime "in the [s]pring of 2016," had a playdate with Amendola's children at Amendola's house. (*Id*. ¶ 55). Amendola's mother confronted Plaintiff during this visit, with Amendola present, commenting, "I heard you was a real bitch." (*Id*. ¶¶ 56-57).[4] Plaintiff explained that she "put walls up" to deal with "the constant harassment and mistreatment that she" endured. (*Id*. ¶ 63). Amendola answered that somebody "told [her] to do those things," expressed

---

[4] At some unspecified time before this interaction, Amendola's mother asked to take a picture with Plaintiff because she was black and people "back home" would not "believe this shit . . . ." (*Id*. ¶ 60).

her "shock[]" that Plaintiff had not quit, and committed to "fixing" their relationship and pushing for Plaintiff's advancement. (*Id*. ¶¶ 64-66). Amendola mused that "she could not wait to see Sharon's face when Plaintiff became a supervisor . . . ." (*Id*. ¶ 66). Months later, in November 2016, Plaintiff was promoted from Administrative Assistant to Practice Supervisor. (*Id*. ¶ 67).

Sometime "in or around 2016," Amendola complained to Plaintiff that a black employee had taken time off for surgery and that, when the employee returned, Amendola planned to "make her life a living hell, so . . . she would quit." (*Id*. ¶¶ 77-78 (internal quotation marks omitted)). Plaintiff claims that she never saw Amendola express such disdain toward white employees who took time off. (*Id*. ¶ 79).

Plaintiff, "in or around November 2016," met with Amendola to discuss staff coverage assignments. (*Id*. ¶ 80). Watching a protest on her computer during that meeting, Amendola commented that "some [b]lack people make themselves look suspicious" and that is why "police have to defend themselves." (*Id*. ¶¶ 81, 84). Amendola also recounted during that meeting an interaction that she and her husband had with "a group of [b]lack men on motorcycles" that made her feel "uncomfortable." (*Id*. ¶ 83).

B. Specific Events During and After January 2017

A white employee named Adrienne, "in or around 2018," swore and yelled at "doctors, patients, and staff." (*Id*. ¶ 96). Amendola "refused to write up Adrienne" for this behavior, notwithstanding the fact that Amendola "would instruct Plaintiff to write up [b]lack employees for . . . not having buttoned up a shirt or wearing certain shoes." (*Id*.). Amendola did, however, have Plaintiff write Adrienne up when the latter "threaten[ed] to punch Plaintiff." (*Id*. ¶ 97). During the related disciplinary meeting, Adrienne tried to leave without permission and Amendola warned "that if she left, she would no longer have a job." (*Id*. ¶ 98). Adrienne left and kept her job. (*Id*.).

4

Sometime during "the [s]ummer of 2018," Amendola spoke with Plaintiff about being promoted to Practice Manager (i.e., Amendola's position) after Amendola was promoted. (*Id.* ¶¶ 99-100). Amendola, in line with this idea, began transferring all of her duties to Plaintiff "[a]round the end of 2018." (*Id.* ¶ 101). Plaintiff insists that this behavior, while appearing benevolent, was a ruse to have Plaintiff perform two jobs by herself, as evidenced by Amendola's refusal to give Plaintiff various opportunities. (*Id.* ¶¶ 103-04, 109). Opportunities Amendola denied Plaintiff included: (1) attending a ceremony to accept an award because "the practice needed coverage;" (2) helping the IT Department train new employees; and (3) taking over, at the suggestion of Vice President of Professional and Support Services Marie Yezzo ("Yezzo"), the Pain Management and Trauma Group. (*Id.* ¶¶ 105-08).

Notwithstanding the denial of some opportunities, Plaintiff made her department WMCAPS' "model department" by assuming a variety of tasks, such as: (1) handling payroll for all doctors and staff; (2) training and retraining staff; (3) interviewing new hires; (4) scheduling daily coverage for medical and support staff; and (5) resolving conflicts. (*Id.* ¶¶ 110-11, 113-14). Plaintiff effectively assumed Amendola's role; indeed, when Amendola was out of the office, supervisors reported to Plaintiff. (*Id.* ¶ 112; *see also id.* ¶¶ 115, 118). The result of Plaintiff's success was that Amendola was regularly out of the office while Plaintiff assumed a slew of new responsibilities without a concomitant change in title or pay. (*Id.* ¶¶ 115-16, 119-20). Plaintiff, "[i]n or around the end of 2018," began experiencing—and sought medical attention for—panic attacks, depression, insomnia, and anxiety caused by her work environment. (*Id.* ¶¶ 121-23).

At some point in March 2019, Amendola told Plaintiff that no promotion was forthcoming. (*Id.* ¶ 124). The decision was based, in part, on Plaintiff's complaint "to another staff member" about how Amendola treated Plaintiff and a white employee named Rebecca differently. (*Id.* ¶¶

125-26). Specifically, at some point, Plaintiff asked Amendola about an e-mail and Amendola ignored her, but when Rebecca asked Amendola the same question about the same e-mail, Amendola answered the question. (*Id*. ¶¶ 127-29). Rebecca told Plaintiff and Plaintiff, in response, complained to Rebecca about the different treatment they received. (*Id*. ¶ 131). Rebecca, in turn, told Amendola. (*Id*. ¶ 132). Amendola opined further that Yezzo felt Plaintiff was "rough around the edges." (*Id*. ¶ 133). Rebecca, at some point thereafter, was promoted to Practice Supervisor (i.e., the same title Plaintiff held). (*Id*. ¶ 134). After the promotion, while Rebecca had less administrative experience, Plaintiff was required to report to both Amendola and Rebecca. (*Id*. ¶¶ 134-35). Amendola likewise told employees that they would report to Rebecca. (*Id*. ¶¶ 137, 140).

Plaintiff, following Rebecca's promotion, asked that she "be formally provided with instructions regarding her new role." (*Id*. ¶ 142). None were provided. (*Id*. ¶ 143).

Plaintiff, sometime that same month, complained to the DLR about Amendola. (*Id*. ¶ 146). Plaintiff spoke with Annie Johnson ("Johnson"), a DLR representative, gave a "statement detailing the discrimination and harassment" she experienced under Amendola, and explained that she had never complained for fear of retaliation. (*Id*. ¶¶ 148-52). Plaintiff told Johnson that "she was reaching a mental and emotional breaking point that was pushing her toward" quitting. (*Id*. ¶ 153). Johnson asked Plaintiff not to quit, told her to take time off, and observed that the "complaint was serious . . . ." (*Id*. ¶ 154). Johnson said she would speak with the head of DLR, but told Plaintiff to speak with Yezzo. (*Id*. ¶¶ 155-56). Plaintiff met with Yezzo in May 2019. (*Id*. ¶ 163). Plaintiff, during that meeting, repeated to Yezzo the substance of what she shared with Johnson. (*Id*.). Yezzo was "surprised" about the allegations, insisted that she never said Plaintiff was "rough around the edges," and told Plaintiff not to quit. (*Id*. ¶¶ 163-65).

6

Plaintiff maintains that after her interaction with Johnson, Amendola left Plaintiff out of meetings but failed to tell doctors that she "was no longer the Practice Supervisor." (*Id*. ¶¶ 157-58). The behavior did not change after the meeting with Yezzo, as "no remedial measures" were taken. (*Id*. ¶¶ 166-67). Plaintiff's relationship with Amendola became "very tense," and Amendola would "treat[] her as if she did not exist." (*Id*. ¶ 168). Plaintiff tried to speak with Amendola "in or around June 2019" about the promotion—but Amendola said simply, "Not here. You will not get that role here. Maybe somewhere else[,] but not here." (*Id*. ¶¶ 169-72).[5]

Amendola was promoted in July 2019 and another individual, Carolyn Trevas-Metz ("Trevas-Metz"), was hired for the Practice Manager position. (*Id*. ¶ 190). Trevas-Metz, a few weeks after assuming Amendola's old position, "reinstated Plaintiff . . . ." (*Id*. ¶ 192; *see also id*. ¶ 193). Trevas-Metz noticed also, in her interactions with Amendola, that Amendola "made discriminatory . . . and negative statements" about Plaintiff and others. (*Id*. ¶ 194; *see also id*. ¶ 195). Trevas-Metz reported that Amendola instructed her to "find ways to justify terminating Plaintiff's employment." (*Id*. ¶ 198). Trevas-Metz refused to comply with that directive, supported Plaintiff, and was ultimately terminated in November 2019. (*Id*. ¶¶ 199-201). That termination made Plaintiff the interim Practice Manager. (*Id*. ¶¶ 202-03). Director of Ambulatory Services Keryi Toni ("Toni") told Plaintiff that she assumed the temporary role with Yezzo's support. (*Id*. ¶ 203). Although Plaintiff expressed an interest in assuming the role permanently, Toni "insisted on . . . a position in another department . . . ." (*Id*. ¶¶ 204-05). Plaintiff was ultimately terminated on December 11, 2019 and a white individual replaced her in the Practice Manager position. (*Id*. ¶¶ 206, 209). Budget cuts were the official reason for both terminations. (*Id*. ¶¶ 201, 207).

---

[5] Plaintiff requested—and was granted—intermittent FMLA leave in June 2019. (Am. Compl. ¶¶ 177-82). Given the parties' stipulation dismissing the FMLA interference claim, the Court does not recount the allegations concerning Plaintiff's use of FMLA leave. (*See id*. ¶¶ 177-89).

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 6, 2020. (*Id*. ¶ 7). The EEOC provided Plaintiff with a Notice of Right to Sue approximately two weeks later, on October 19, 2020. (*Id*.). Plaintiff initiated this action by filing the Complaint on January 15, 2021. (Doc. 1).

       C.  <u>Specific Events Untethered to a Specific Time</u>

In addition to the incidents identified above, Plaintiff provides a number of undated, anecdotal stories about her interactions with Amendola. Plaintiff recounted, for example, that "[o]n one specific occasion," Amendola made derogatory comments about how Sharon lived in the Bronx, mused aloud about how two patients—one of whom was black—made her uncomfortable, and ended the conversation with statements about how it was a "good thing" that Plaintiff did not "act [b]lack" by wearing certain clothes, nails, or hairstyles, and tried to "better" her life by leaving the Bronx. (Am. Compl. ¶¶ 87-92; *see also id*. ¶¶ 75-79 (alleging that from 2016 to 2019, Amendola "frequently" accused black employees who were out sick of lying), ¶ 194 (claiming that Amendola made comments about Sharon being "from the Bronx" to Trevas-Metz)).[6]

## **STANDARD OF REVIEW**

A Rule 12(b)(6) motion enables a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads

---

[6] Defendants do not argue that these allegations should be disregarded for want of specificity. (*See generally* Def. Br.; Reply Br.). The Court, therefore, considers the allegations. *See Keesh v. Quick*, No. 19-CV-08942, 2021 WL 639530, at *11 n.7 (S.D.N.Y. Feb. 17, 2021) ("[I]t is not this Court's responsibility to raise and make counsel's arguments for them." (quoting *Moore v. Peters*, 92 F. Supp. 3d 109, 126 (W.D.N.Y. 2015) (alteration in original))).

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). The factual allegations pled "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

"When there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Thus, the Court must "take all well-ple[d] factual allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff[]." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). The presumption of truth, however, "'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678 (alteration in original)). Therefore, a plaintiff must provide "more than labels and conclusions" to show entitlement to relief. *Twombly*, 550 U.S. at 555.

## **ANALYSIS**

The Court considers Defendants' arguments for dismissing each claim for relief *seriatim*.

I.   The Continuing Violation Doctrine and Hostile Work Environment Claims

Plaintiff's fact pattern reaches back more than a decade—from not being invited to a holiday party in 2008 (before WMCAPS became her employer) to being terminated in 2019. That being the case, the Court turns first to the parties' disagreement over the continuing violation doctrine and its applicability to Plaintiff's hostile work environment claims.

Defendants, citing statutes of limitations, argue that the Court must disregard allegations predating: (1) January 15, 2017 (i.e., four years before the action was filed) with respect to the

claim under 42 U.S.C. § 1981; and (2) January 15, 2018 (i.e., three years before the action was filed) as to the Title VII and NYSHRL claims. (Def. Br. at 9).[7] Plaintiff, conceding tacitly that a variety of allegations fall outside the statutes of limitations, argues *inter alia* that the continuing violation doctrine allows the Court to consider properly the decade-long fact pattern as to her Title VII and NYSHRL hostile work environment claims. (Opp. Br. at 4-6).[8]

"A continuing violation is 'composed of a series of separate acts that collectively constitute one unlawful employment practice.'" *Reyes v. Westchester Cty. Health Care Corp.*, No. 21-0410, 2021 WL 4944285, at *4 (2d Cir. Oct. 25, 2021) (quoting *Washington v. Cty. of Rockland*, 373

---

[7] The parties misstate the statute of limitations governing Title VII claims. Under that statute, a Charge of Discrimination initiating review by the EEOC—a prerequisite to filing suit in federal court—must be filed:

> within *one hundred and eighty days* after the alleged unlawful employment practice occurred . . . *except* that in a case of an unlawful employment practice with respect to which the person aggrieved has *initially instituted proceedings with a State or local agency* . . . such charge shall be filed . . . within *three hundred days* after the alleged unlawful employment practice occurred, *or* within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

42 U.S.C. § 2000e-5(e)(1) (emphasis added); *see also Wickes v. Westfair Elec. Co.,* No. 19-CV-10673, 2021 WL 217318, at *4 (S.D.N.Y. Jan. 20, 2021) (explaining that a Title VII plaintiff must file an EEOC Charge of Discrimination within 180 or 300 days after the alleged unlawful employment); *Medina v. Waste Connections of New York, Inc.*, No. 19-CV-00291, 2019 WL 3532048, at *4 n.4 (S.D.N.Y. Aug. 2, 2019) ("Section 2000e-5(e)(1) sets 180 days as the standard time limit, with an exception where the person aggrieved has initially instituted proceedings with a State or local agency . . . in which case the time limit extends to 300 days. Second Circuit case law is somewhat unclear concerning whether the 300-day limit applies automatically in New York, to all Title VII claims, because of the existence of a state anti-discrimination agency." (internal quotation marks omitted)).

[8] As to the remaining six claims for relief, Plaintiff argues that allegations before January 15, 2017 or January 15, 2018 may be considered for context. (Opp. Br. at 5). Defendants do not address this argument. (*See* Reply Br. at 1-2). Even if Defendants did not concede the argument by failing to respond to it, it is well-established that the Court may consider allegations outside the statutes of limitations as background and context for actionable allegations. *See Tenemille v. Town of Ramapo*, No. 18-CV-00724, 2020 WL 5731964, at *8 (S.D.N.Y. Sept. 24, 2020); *Imperato v. Otsego Cty. Sheriff's Dep't*, No. 13-CV-01594, 2016 WL 1466545, at *14 (N.D.N.Y. Apr. 14, 2016); *Magadia v. Napolitano*, No. 06-CV-14386, 2009 WL 510739, at *11 (S.D.N.Y. Feb. 26, 2009).

F.3d 310, 317 (2d Cir. 2004)). Notwithstanding the nuances applicable in other contexts (i.e., discrimination or retaliation), a hostile work environment claim, by its "very nature involves repeated conduct," and, as such, "cannot be said to occur on any particular day." *Richard v. New York City Dep't of Educ.*, No. 16-CV-00957, 2017 WL 1232498, at *14 (E.D.N.Y. Mar. 31, 2017) (quoting *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010)). Because "[a]n employer's creation of a hostile work environment is a quintessential continuing violation," *Campo v. City of New York*, No. 19-CV-04364, 2022 WL 970730, at *23 (E.D.N.Y. Mar. 31, 2022) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 (2002) (internal quotation marks omitted)), "so long as an act contributing to that hostile environment takes place within the statutory time period," *Richard*, 2017 WL 1232498, at *14 (internal quotation marks omitted), the Court may consider conduct outside the statute of limitations period. The final act in the hostile work environment narrative here (i.e., termination on December 11, 2019) falls within the Title VII and NYSHRL statutes of limitations stated by the parties. Assuming, without deciding, that the parties have properly set forth the statute of limitations for a Title VII hostile work environment claim, the Court considers allegations prior to January 15, 2018 in evaluating both species of hostile work environment claims. *See Reyes*, 2021 WL 4944285, at *4.

Having determined the impact of the continuing violation doctrine vis-à-vis the hostile work environment claims, the Court turns to Defendants' arguments concerning whether Plaintiff has stated plausible claims for relief.

II.    Claims for Relief

Plaintiff's claims for relief proceed under 42 U.S.C. § 1981, Title VII, and the NYSHRL. (*See* Am. Compl. ¶¶ 217-33, 240-55). The Court considers these claims for relief in turn.

A.  Race Discrimination Claims

The second, fourth, and seventh claims for relief—proceeding under Title VII, 42 U.S.C. § 1981, and the NYSHRL, respectively—allege that Plaintiff was discriminated against because of her race. (*Id.* ¶¶ 222-26, 231-33, 244-47). Plaintiff, in order to state any one of these three claims, must plead: "(1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation . . . ." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015) (emphasis in original); *see also Awad*, 2014 WL 1814114, at *5 ("Discrimination claims under § 1981 . . . and NYSHRL are analyzed under the same framework and pleading standard as Title VII claims.").[9] While these claims are each subject to the familiar *McDonnell-Douglas* burden shifting framework, the only question before the Court is whether a *prima facie* claim of discrimination has been pled plausibly. *See generally Hill v. City of New York*, 136 F. Supp. 3d 304, 332-33 (E.D.N.Y. 2015) ("[C]ourts generally treat the elements of a *prima facie* case as an outline of what is necessary to render a plaintiff's employment discrimination claims for relief plausible to survive a motion to dismiss." (internal quotation marks omitted)).

Defendants argue that Plaintiff failed to identify any adverse action except termination and, in any event, has not pled facts suggesting an inference of discrimination. (*See* Def. Br. at 11-18).

These arguments miss the mark.

---

[9] Although it has no bearing at this stage of the case, the Court notes that "Section 1981 claims are subject to different standards for causation. Under section 1981, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Cardwell v. Davis Polk & Wardwell LLP*, No. 19-CV-10256, 2021 WL 4434935, at *21 n.9 (S.D.N.Y. Sept. 23, 2021) (internal quotation marks omitted).

First, termination is as an adverse employment action under all three statutes. *See Abalola v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 20-CV-06199, 2022 WL 973861, at *6 (S.D.N.Y. Mar. 30, 2022); *United States v. New York City Dep't of Educ.*, 407 F. Supp. 3d 365, 393 (S.D.N.Y. 2018). Accordingly, because Plaintiff was fired, she has pled plausibly the adverse employment action element of each claim for relief. The Court need not and will not parse through what other allegations may or may not qualify as an adverse employment action.

Second, as to the inference of discrimination, Plaintiff was terminated from her position as interim Practice Manager and a white person was hired to replace her. (Am. Compl. ¶ 208-09). That is enough, at this stage and on these facts, to meet the *de minimis* burden required to state a *prima facie* claim of discrimination under each statute. *See, e.g.*, *Styles v. Westchester Cty.*, No. 18-CV-12021, 2020 WL 1166404, at *8 (S.D.N.Y. Mar. 10, 2020) ("[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis." (quoting *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (alteration in original)); *Isbell v. City of New York*, 316 F. Supp. 3d 571, 591 (S.D.N.Y. 2018) (denying motion to dismiss NYSHRL and § 1981 race discrimination claims because alleging that the black plaintiffs were "largely replaced by non-African American individuals" pled sufficiently an inference of discrimination (internal quotation mark omitted)); *see also Cargian v. Breitling USA, Inc.*, No. 15-CV-01084, 2021 WL 4780327, at *8 (S.D.N.Y. Sept. 13, 2021).

The motion to dismiss the Title VII, § 1981, and NYSHRL discrimination claims is denied.

### B.   Retaliation Claims

The third and eighth claims for relief allege Title VII and NYSHRL retaliation. (Am. Compl. ¶¶ 227-30, 248-51). These claims proceed on the theory that Plaintiff was terminated for

complaining about discrimination. (*Id*. ¶ 229). Stating a *prima facie* retaliation claim under either statute requires Plaintiff to plead that: "(1) [she] was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Mitchell v. State Univ. of New York Upstate Med. Univ.*, 723 F. App'x 62, 63 (2d Cir. 2018) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)); *see also Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) ("The standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL."); *Peck v. Cty. of Onondaga, New York*, No. 21-CV-00651, 2021 WL 3710546, at *7 (N.D.N.Y. Aug. 20, 2021) ("Although there are certainly differences between . . . Title VII[] and the NYSHRL, the same elements apply to each, at least at the pleading stage . . . ." (internal citations omitted)). The parties, relying on their calculations of the statutes of limitations, argue over whether four activities are protected and whether Plaintiff has pled a causal connection with a materially adverse action. (*Compare* Def. Br. at 22, *with* Opp. Br. 21-22). The Court need not address all four activities because at least one supports a claim for relief under both statutes.

Amendola, in March 2019, told Plaintiff that she was being denied the promotion to Practice Manager because, at least in part, Plaintiff complained to Rebecca about how Plaintiff believed Amendola treated them differently because of their races. (Am Compl. ¶¶ 124-33). While Plaintiff's complaint may have been to a coworker, two points are crystal clear: (1) the complaint was about differential treatment between Plaintiff and a white employee, expressing the belief that the differing treatment was based on race; and (2) Amendola denied Plaintiff a promotion, in part, because of that complaint. That Plaintiff's informal complaint was to a coworker is immaterial; granting Plaintiff the inferences to which she is entitled at this stage, the subject activity may well

be protected. *See, e.g.*, *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (explaining that protected activity in Title VII retaliation claims "includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges'" (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)); *MacAlister v. Millenium Hotels & Resorts*, No. 17-CV-06189, 2018 WL 5886440, at *8 (S.D.N.Y. Nov. 8, 2018) (reiterating the same standard as to both Title VII and NYSHRL retaliation claims); *see also Soto v. Marist Coll.*, No. 17-CV-07976, 2019 WL 2371713, at *10 (S.D.N.Y. June 5, 2019) (dismissing Title VII and NYSHRL retaliation claims for want of causation, but observing that the *pro se* plaintiff "arguably protest[ed] against discrimination by industry or by society in general by discussing the lack of diversity at Marist with his class" (internal quotation marks omitted)). As for causation, Plaintiff pled that Amendola said that the complaint was a reason why the promotion was denied. (Am. Compl. ¶¶ 124-33). No clearer connection can be pled.

The motion to dismiss Title VII and NYSHRL retaliation claims is denied.

C.   Hostile Work Environment Claims

The first claim for relief presses a claim for hostile work environment on the basis of race under Title VII, and the sixth claim for relief presents a claim for hostile work environment on the basis of race and gender under the NYSHRL. (Am. Compl. ¶¶ 217-21, 240-43). The Court considers these claims for relief separately.[10]

---

[10] Although not mentioned by the parties, the NYSHRL was amended, effective October 11, 2019. *See Makhsudova v. City of New York*, No. 20-CV-10728, 2022 WL 1571152, at *5 n.7 (S.D.N.Y. May 18, 2022) ("The New York State Legislature passed several amendments to the NYSHRL in June 2019, the effect of which was to render the standard for claims closer to the standard under the NYCHRL."). That amendment impacts the Court's analysis of Plaintiff's hostile work environment claim under the NYSHRL.

i.   Title VII Hostile Work Environment

To state a hostile work environment claim under Title VII, Plaintiff must allege: "[1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (alterations in original)). The harassing conduct must, of course, be caused by Plaintiff's "membership in a protected class," *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999), and the test "has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Thomson v. Odyssey House*, No. 14-CV-03857, 2015 WL 5561209, at *13 (E.D.N.Y. Sept. 21, 2015) (quoting *Littlejohn*, 795 F.3d at 321), *aff'd*, 652 F. App'x 44 (2d Cir. 2016). While a single severe incident may suffice, "[a]s a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (internal quotation marks omitted). The focus is the totality of the circumstances. *Smith v. Westchester Cty. Dep't of Corr.*, No. 12-CV-03941, 2014 WL 4384104, at *9 (S.D.N.Y. Sept. 3, 2014). A totality-of-the-circumstances evaluation means that courts examine:

> the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) (alterations in original)). At the motion to

dismiss stage, "a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Jeanty v. Precision Pipeline Sols., LLC*, No. 18-CV-07721, 2019 WL 3532157, at *4 (S.D.N.Y. Aug. 2, 2019) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted)).

The parties do not dispute that Plaintiff perceived the environment to be abusive and severe. The question presented is whether—looking at the totality of the circumstances—the allegations suggest plausibly that a reasonable person would reach the same conclusion.

More than ten years before Plaintiff filed this action, in 2008, she was not invited to the office holiday party. (Am. Compl. ¶¶ 23-29). Months after that, in the summer of 2009, Amendola told Plaintiff's coworker that she would not advance if she stayed friends with Plaintiff. (*Id*. ¶¶ 30-31).[11] Some five years later, in September 2014, Amendola: (1) accosted Plaintiff and Sharon; and (2) changed Plaintiff's assignment so she could "watch" her. (*See id*. ¶¶ 48-51). Roughly two years later, in the spring of 2016, Amendola's *mother* insulted Plaintiff. (*See id*. ¶¶ 55-60). Sometime "in or around 2016," Amendola confided in Plaintiff that she intended to make a black employee's life a "living hell." (*See id*. ¶¶ 77-78). In November 2016, Amendola complained to Plaintiff that "some [b]lack people make themselves look suspicious." (*See id*. ¶¶ 80-84). Approximately two years after that, "in or around 2018," Amendola refused to write-up a white employee for an outburst, but relented after that employee threatened Plaintiff. (*Id*. ¶¶ 96-97). About one year later, in March 2019, Amendola told Plaintiff that she would not be promoted because of the complaint to Rebecca. (*Id*. ¶¶ 124-32). After being denied the promotion and initiating the internal complaint

---

[11] The Court need not and does not address whether the events predating WMCAPS' acquisition of MRA are actionable against WMCAPS under Title VII. Rather, the Court considers these allegations at this stage only to the extent that they provide context and background to Plaintiff's relationship with Amendola.

procedures that March—and until her termination that December—Amendola left Plaintiff out of meetings, failed to advise staff about changes to Plaintiff's role, and generally ostracized Plaintiff—resulting in the relationship between the two becoming "very tense." (*See id.* ¶¶ 157-60, 166-67, 168-72). Littered among these incidents are allegations that Amendola made consistently derogatory comments about people who live in the Bronx, treated black employees different from white employees with respect to discipline and sick leave, and, on one occasion, mused about how it was a "good thing" that Plaintiff did not "act [b]lack" by wearing certain clothes, nails, or hairstyles. (*See id.* ¶¶ 75-79, 87-90, 92, 194).

As the Second Circuit reiterated recently, in order for:

> racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment.

*Miller v. New York State Police*, No. 20-3976, 2022 WL 1133010, at *2 (2d Cir. Apr. 18, 2022) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). "'There is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment . . . .'" *Augustin v. Yale Club of New York City*, No. 03-CV-01924, 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (quoting *Alfano*, 294 F.3d at 379), *aff'd sub nom. Augustin v. The Yale Club of New York City*, 274 F. App'x 76 (2d Cir. 2008). Notwithstanding the fact that the specific events were sometimes separated by months or years, given Amendola's purportedly endless commentary about black people and her behavior directed toward Plaintiff (or other black people), the inference linking conduct to race is apparent—and it is entirely plausible that the totality of these

circumstances would allow a reasonable employee to conclude that Plaintiff's conditions of employment were altered for the worse. *See Cano v. SEIU Loc. 32BJ*, No. 19-CV-08810, 2021 WL 4927166, at *6 (S.D.N.Y. June 15, 2021) ("[W]hether conduct is severe or pervasive enough to successfully state a claim for hostile work environment is generally inappropriate to determine on a motion to dismiss." (citing *Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 224 (E.D.N.Y. 2018)), *adopted by* 2021 WL 4480274 (S.D.N.Y. Sept. 30, 2021); *Bernardi v. New York State Dep't of Corrs.*, No. 19-CV-11867, 2021 WL 1999159, at *7 (S.D.N.Y. May 19, 2021) ("He claims that he experienced many such comments, and that they continued unchecked, throughout his employment, which spanned from 2002 through at least 2018. These allegations suffice at this stage to establish that the comments were sufficiently frequent, even though the Amended Complaint is not entirely specific about the exact dates of certain incidents." (cleaned up)); *cf. Rubert v. King*, No. 19-CV-02781, 2020 WL 5751513, at *9 (S.D.N.Y. Sept. 25, 2020) (concluding, on a motion to dismiss in a *pro se* case, a plausible hostile work environment claim under 42 U.S.C. § 1981 existed where, while identifying only a single specific use of a slur, plaintiff explained that the defendant "used the word . . . over a prolonged period of time . . . .").

The Court cannot conclude as a matter of law that Plaintiff has failed to state a Title VII hostile work environment claim. The ultimate question as to whether the conduct that actually transpired is of a vintage that would be considered objectively hostile may be revisited after the close of discovery. The motion to dismiss the Title VII hostile work environment claim is denied.

ii.   NYSHRL Hostile Work Environment

Neither Plaintiff nor Defendants applied the proper standard for a NYSHRL hostile work environment claim. For those claims accruing after October 19, 2019—like the one at issue here—New York State law instructs that it is unlawful for:

> an employer . . . to subject any individual to harassment because of
> an individual's . . . race . . . [or] sex . . .  regardless of whether such
> harassment would be considered severe or pervasive under
> precedent applied to harassment claims. Such harassment is an
> unlawful discriminatory practice when it subjects an individual to
> inferior terms, conditions or privileges of employment because of
> the individual's membership in one or more of these protected
> categories. . . . It shall be an affirmative defense to liability under
> this subdivision that the harassing conduct does not rise above the
> level of what a reasonable victim of discrimination with the same
> protected characteristic or characteristics would consider petty
> slights or trivial inconveniences.

N.Y. Exec. Law § 296(1)(h). This amendment "eliminate[s] the requirement that harassing or

discriminatory conduct be severe or pervasive for it to be actionable and . . . adopt[s] instead a

more protective standard that prohibits conduct that results in inferior terms, conditions, or

privileges of employment." *Maiurano v. Cantor Fitzgerald Sec.*, No. 19-CV-10042, 2021 WL

76410, at *3 n.2 (S.D.N.Y. Jan. 8, 2021) (internal quotation marks omitted)); *see also McHenry v.

Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) (explaining that "the NYSHRL

was amended to direct courts to construe the NYSHRL, like the NYCHRL, liberally for the

accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws .

. . worded comparably . . . have been so construed" (internal quotation marks omitted)).

Defendants, instead of applying this new liberal standard, operated under the assumption

that the NYSHRL hostile work environment claim rose and fell with the now-by-comparison

heightened standard imposed by Title VII. (*See, e.g.*, Def. Br. at 18-22; Reply Br. at 6-8). Given

Defendants' reliance on an outdated standard, the Court is unable to conclude that they have

satisfied their burden of proof on this motion. Phrased another way, "the Court cannot determine

on these papers that Defendant[s] . . . established as a matter of law that Plaintiff has not stated a

plausible claim for relief." *Doe v. King*, No. 20-CV-02331, 2021 WL 4198275, at *4 (S.D.N.Y. Sept. 13, 2021).

The motion to dismiss the NYSHRL hostile work environment claim based on race and gender discrimination is denied.[12]

D.  NYSHRL Aider and Abettor Liability Claim

The final issue for consideration is the ninth claim for relief—aiding and abetting against Amendola under the NYSHRL. (Am. Compl. ¶¶ 252-55). The operative provision of the NYSHRL provides, in full:

> [i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.

N.Y. Exec. Law § 296(6). A claim under this provision requires that the "defendant actually participated in the alleged discriminatory acts." *Bonterre v. City of New York*, No. 18-CV-00745, 2021 WL 4060358, at *7 (S.D.N.Y. Sept. 7, 2021) (internal quotation marks omitted); *see also Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 367 (S.D.N.Y. 2012) ("To be liable under § 296(6), an individual employee need not have supervisory or hiring and firing power, but must have 'actually participated in the conduct giving rise to the claim.'" (quoting *Feingold*, 366 F.3d at 158)). Amendola is the source of all the discriminatory conduct of which Plaintiff complains. The motion to dismiss the aider and abettor claim against Amendola is denied.

---

[12] Of course, as Plaintiff pled a plausible Title VII hostile work environment claim based on race, it stands to reason that she necessarily pled a plausible race-based NYSHRL hostile work environment claim under the latter's more liberal standard. This provides a separate basis for denying Defendants' motion to dismiss the NYSHRL hostile work environment claim—to the extent it proceeds on a theory of race discrimination— which the Court adopts.

## CONCLUSION

In light of the foregoing, Defendants' motion to dismiss is DENIED. Defendants shall file an Answer to the Amended Complaint within twenty-one days of the date of this Memorandum Opinion and Order. The Court shall set an initial pretrial telephone conference in short order.

The Clerk of the Court is respectfully directed to terminate the motion sequence pending at Doc. 37.

**SO ORDERED:**

Dated:   White Plains, New York
         August 9, 2022

_____
PHILIP M. HALPERN
United States District Judge